UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DOYNOW SALES ASSOCIATES, INC.,                  :

                Plaintiff,                  :          08 Civ. 8043 (AJP)

         -against-                  :          **OPINION AND ORDER**

ROCHEUX INTERNATIONAL OF NEW JERSEY,    :
INC. a/k/a ROCHEUX INTERNATIONAL, INC.,

                                   :

             Defendant.                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

Plaintiff Doynow Sales Associates, Inc. ("DSA") brings this action alleging that

Rocheux International of New Jersey, Inc., a wholesale commercial distributor of swimming pool

liners and other plastic products, breached its contract with DSA when it reduced DSA's sales

commissions in part or entirety on at least two accounts with large pool distributors.  (See generally

Dkt. No. 18: Am. Compl.)

Presently before the Court is DSA's summary judgment motion (Dkt. No. 32: DSA

Notice of Motion; see also Dkt. No. 34: Lucas Aff.; Dkt. No. 35: Steven Doynow Aff.; Dkt. No. 36:

Larry Doynow Aff.; Dkt. No. 37: DSA Rule 56.1 Stmt.; Dkt. No. 42: DSA Br.), and Rocheux's

summary judgment motion (Dkt. No. 38: Rocheux Notice of Motion; see also Dkt. No. 39:

Stephanoff Aff.; Dkt. No. 40: Schwartz Aff.; Dkt. No. 41: Rocheux Br.; Dkt. No. 43: Rocheux Rule

56.1 Stmt.).  The parties have consented to decision of this case by a Magistrate Judge pursuant to

28 U.S.C. § 636(c).  (Dkt. No. 9.)

        For the reasons set forth below, DSA's and Rocheux's summary judgment motions

both are DENIED.

## FACTS

        Rocheux distributes and sells industrial plastics, including "vinyl for swimming pool

liners" manufactured by "NanYa Plastics Corp. of Ta[i]wan."  (Dkt. No. 37: DSA Rule 56.1 Stmt.

¶ 9; Dkt. No. 35: Steven Doynow Aff. ¶ 9; Dkt. No. 43: Rocheux Rule 56.1 Stmt. ¶ 1.)  DSA, which

employs Steven Doynow as a sales representative, entered into a "Sales Representative Agreement"

with Rocheux in May 1992 to sell Rocheux "products in a specified territory" as a "non-exclusive

sales representative" "in exchange for commissions on sales."  (DSA Rule 56.1 Stmt. ¶¶ 7, 17;

Steven Doynow Aff. ¶¶ 7, 17; Rocheux 56.1 Stmt. ¶¶ 2-3; see Dkt. No. 40: Schwartz Aff. Ex. A:

5/5/1992 Sales Representative Agreement.)  "The focus of DSA's sales to Rocheux customers has

been the sale of vinyl to swimming pool manufacturers and distributors."  (DSA Rule 56.1 Stmt.

¶ 31; Steven Doynow Aff. ¶ 22.)

**The Sales Representative Agreement**

        The Sales Representative Agreement (the "Agreement") was drafted by Rocheux

based on a Rocheux form agreement.  (Dkt. No. 37: DSA Rule 56.1 Stmt. ¶¶ 15-16, 136-41.)  The

Agreement "appoints [DSA] as an authorized nonexclusive [sales] agent for the Rocheux Products

specified in Schedule A . . . [to] market and promote the sale of, to solicit orders for, and to service

orders for the Products, in the geographic area specified in Schedule B . . . ." (Dkt. No. 40: Schwartz Aff. Ex. A: Agreement ¶ 1.)[1/]  DSA's geographic area includes the entire "[c]ontinental U.S." (Schwartz Aff. Ex. A: Agreement at p. 11, Schedule B.)  Schedule A to the Agreement establishes the following compensation structure:

> [DSA]'s total compensation under this Agreement shall consist of the following percentages of the Rocheux sales price paid to and reviewed by Rocheux for Products shipped based on orders, released and options exercised and accepted by Rocheux during the term of this Agreement through the efforts of [DSA].
>
> Sales commission shall be 3-5% except in cases, which in order to entertain large volume accounts, it may be necessary upon mutual agreement to reduce [DSA's] commission.

(Schwartz Aff. Ex. A: Agreement at p. 12, Schedule A(3), emphasis added.)

The Agreement also contains a "merger clause" and provides a specific procedure to modify the Agreement:

> This Agreement supersedes any previous Agreement or negotiations between the parties, either expressed or implied, and constitutes the entire Agreement between the parties.  It shall not be amended or modified except by a subsequent written agreement signed by the party to be bound thereby.  Modifications to Schedules A and B shall be accomplished by both parties signing and dating the schedule modified as desired and appending the modified schedule to the contract. . . . The failure or delay of either party to exercise any right hereunder shall not be deemed to be a waiver of such right, and the delay or failure to terminate this Agreement for noncompliance or breach shall not be deemed a waiver of the right to do so for that or any . . . other such default, of the persistence in such default of a continuing nature.

(Schwartz Aff. Ex. A: Agreement ¶ 11.)

---

[1/]    Schedule A "limits" the Agreement to all Rocheux products "currently manufactured and/or sold by Rocheux as of the effective date of this Agreement."  (Schwartz Aff. Ex. A: Agreement at p. 12, Schedule A(1)-(2).)

The Agreement commenced on May 1, 1992, and "was automatically renewed for successive five-year terms beginning on May 1, 1997, May 1, 2002 and May 1, 2007," and "remains in force and is not scheduled to expire until May 1, 2012." (DSA Rule 56.1 Stmt. ¶¶ 25, 26, 29, 54; Dkt. No. 35: Steven Doynow Aff. ¶¶ 18-20, 41; see Schwartz Aff. Ex. A: Agreement ¶ 5.)  Either party can prevent the Agreement's automatic renewal by providing the other party "a written notice of non-renewal at least six months before the Agreement's expiration." (DSA Rule 56.1 Stmt. ¶ 25; Schwartz Aff. Ex. A: Agreement ¶ 5.)[2/]

The Agreement contains a non-compete clause binding DSA for the term of the agreement and twelve months after termination (i.e., through May 1, 2013). (DSA Rule 56.1 Stmt. ¶ 30; see Schwartz Aff. Ex. A: Agreement ¶ 8.)  Rocheux, however, claims the non-compete "applies only to competition with NanYa products, not to Rocheux." (Dkt. No. 48: Rocheux Opp. Rule 56.1 Stmt. ¶ 8.)  DSA maintains that it "remains bound by the Agreement's non-compete clause . . . until May 1, 2013," even though "Rocheux has eliminated or virtually eliminated 100% of DSA's compensation by unilaterally converting DSA's accounts into 'house accounts.'" (DSA Rule 56.1 Stmt. ¶ 30.)

---

[2/]    In addition, Rocheux may terminate the Agreement for DSA's noncompliance if DSA "is given written notice of its default and a 30-day opportunity to cure," (DSA Rule 56.1 Stmt. ¶ 27; see Schwartz Aff. Ex. A: Agreement ¶ 6A.)  "Rocheux has never notified DSA of any intent to terminate the Agreement, and has never provided DSA with any notice specified in paragraph 6.A(2) of the Agreement." (DSA Rule 56.1 Stmt. ¶ 28; Steven Doynow Aff. ¶ 19.)

"Any dispute arising under th[e] Agreement not resolved by agreement of the parties shall be . . . governed and construed by the laws of New Jersey and the USA, excluding New Jersey choice of law rules." (Schwartz Aff. Ex. A: Agreement ¶ 12; see DSA Rule 56.1 Stmt. ¶ 24.)

**The Parties' Construction of the Agreement's Commissions Provision**

DSA maintains that the "Agreement does not contain any clause permitting Rocheux to convert DSA's accounts into house accounts or to otherwise cease paying DSA commissions, and expressly requires Rocheux to pay [DSA] commissions on 'all orders' accepted by Rocheux prior to the Agreement's termination date." (Dkt. No. 37: DSA Rule 56.1 Stmt. ¶ 20; see Dkt. No. 40: Schwartz Aff. Ex. A: Agreement ¶¶ 4D, 6D.) DSA claims that "[u]pon bringing in the account, the [sales] 'rep[resentative] [is] deemed to be the sales rep on the account as long as the orders continued from that customer,'" and "having generated the account . . . would thereafter receive the commissions from sales to that account." (DSA Rule 56.1 Stmt. ¶¶ 34, 35, 40-47.) Only when the Agreement ends would Rocheux "have no obligation to pay DSA any commissions" on "orders from customers generated through DSA's efforts." (DSA Rule 56.1 Stmt. ¶ 55.)

In contrast, Rocheux maintains that the "Agreement does not prohibit Rocheux from re-assigning accounts" because ¶ 2B of the Agreement provides Rocheux "the sole right . . . to establish the terms and conditions of any sale it makes; . . . to establish policies regarding sales solicitation . . . ; and to establish such other policies or procedures as it may deem necessary for the effective marketing of its products." (Dkt. No. 48: Rocheux Opp. Rule 56.1 Stmt. ¶ 4; Schwartz Aff. Ex. A: Agreement ¶ 2B.) Further, Rocheux argues that its "[c]ommission rates under the Agreement

are based on the profitability of each account and are established customer by customer," that it "establish[ed] commission rates on a customer by customer basis" with DSA during their "course of dealing" for over eighteen years, and that Rocheux only determined DSA's "available commission" once it reached a "final price . . . with a customer," establishing "the account's potential gross profit." (Rocheux Opp. Rule 56.1 Stmt. ¶¶ 9, 10; see also DSA Rule 56.1 Stmt. ¶¶ 131, 134-35.)

In addition, Rocheux argues that the Agreement provides for compensation only for "ongoing" services, "including the soliciting of orders, servicing of accepted orders, maintaining relationships with actual and prospective customers, maintaining records, and as otherwise detailed in paragraphs 3A, B, and F and 4A and B of the Agreement." (Rocheux Opp. Rule 56.1 Stmt. ¶ 5; see Schwartz Aff. Ex. A: Agreement ¶¶ 3 & 4.) Those paragraphs of the Agreement provide the following:

3. Responsibilities of the Representative [DSA]

A. [DSA] agrees to maintain at its own expense adequate facilities, for the effective sale of the Products in the Territory, and for the adequate and competent servicing of accepted orders.

B. [DSA] shall take all reasonable steps to make Rocheux's Products known in the Territory, shall cooperate with and assist with and assist Rocheux in promotional and advertising campaigns, and shall use its best efforts to maintain good relationships with all of Rocheux's actual or prospective customers and to work constantly and diligently in the best interests of Rocheux.

. . . .

F. [DSA] shall maintain records, accounts, copies of purchase orders and correspondence pertaining to its activities on behalf of Rocheux, all of which shall

be available for review if requested by Rocheux. [DSA] shall keep Rocheux well informed regarding sales efforts on Rocheux's behalf, and upon request shall update Rocheux regarding [DSA]'s current staff of sales personnel, principles represented and changes in coverage within the territory.

. . . .

4. Compensation

A.  In full payment for services rendered by [DSA] under this Agreement, Rocheux agrees to pay [DSA], and [DSA] agrees to accept as its sole and entire compensation, a commission . . . on the sales price of products sold by Rocheux through the efforts of [DSA] hereunder and for which Rocheux has received payment from the customer . . . . The amount of such contained in [sic; perhaps, "commissions"] shall be set in accordance with the schedule contained in Schedule A hereto, on the sales price of Products sold hereunder and shipped to any customer.  When multi-year agreements, options to purchase, letters of intent to purchase, or agreements for sales orders to be placed upon periodic releases are involved, commission shall be paid only upon orders, options and releases exercised and accepted by Rocheux during the term of the Agreement and only on the sales price of that portion of the Products shipped for which Rocheux has received payment.

B. . . . [DSA] agrees to use its best efforts to continues to maintain [Rocheux's] reputation and image in regard to the Products in the Territory during the period of this Agreement.

(Schwartz Aff. Ex. A: Agreement ¶¶ 3, 4.)

## DSA Commissions on the Swimline Account

Swimline Corporation "sells finished pool liners to the above ground pool market and is a customer of Rocheux." (Dkt. No. 43: Rocheux Rule 56.1 Stmt. ¶ 5; Dkt. No. 50: DSA Opp. 56.1 Stmt. ¶ 5; Dkt. No. 48: Rocheux Opp. Rule 56.1 Stmt. ¶ 14.)  "Approximately twenty years ago and for a period of two or three years, Swimline purchased supplies of vinyl directly from NanYa," but

"stopped buying from NanYa for five years." (Rocheux Rule 56.1 Stmt. ¶ 6; Rocheux Opp. Rule 56.1 Stmt. ¶ 15; Dkt. No. 37: DSA Rule 56.1 Stmt. ¶ 88.)

Rocheux claims that "[a]fter [a] five year hiatus," Swimline President Larry Schwimmer "'cold called' Rocheux to place an order for a 'standard product,'" and that "Rocheux assigned DSA to the Swimline account." (Rocheux Rule 56.1 Stmt. ¶ 7; Rocheux Opp. Rule 56.1 Stmt. ¶¶ 14, 16.)

DSA, however, denies that Swimline "cold-called" Rocheux (DSA Opp. 56.1 Stmt. ¶ 7), claiming that Steven Doynow's father, Larry Doynow – who "was employed by DSA as a sales representative from late 1983 or early 1984 until about 1999" – had established a relationship with Swimline prior to any contact between DSA and Rocheux, and around 1990 convinced Schwimmer to purchase a "'trial order' of solid pool liner" from NanYa, after which Swimline "incrementally increas[ed]" its purchases from Nan Ya. (DSA Rule 56.1 Stmt. ¶¶ 6, 7, 82-97; Dkt. No. 36: Larry Doynow Aff. ¶¶ 2-17.) Around 1991, "Nan Ya stopped selling vinyl directly to U.S. customers, and Rocheux began buying Nan Ya products for resale to U.S. customers," Larry Doynow began "repping for Rocheux," and "all of DSA's customers from Nan Ya (including Swimline) switched over to Rocheux." (DSA Rule 56.1 Stmt. ¶¶ 98-101; Larry Doynow Aff. ¶¶ 18-21.) "[O]n or about May 1, 1992, . . . Steven Doynow became a DSA sales representative," signed the Sales Representative Agreement with Rocheux, and shortly thereafter "became the DSA representative on the Swimline account." (DSA Rule 56.1 Stmt. ¶¶ 102-07; Larry Doynow Aff. ¶¶ 22-27.)

Rocheux claims that:

In 2002, Swimline advised Rocheux that it did not want DSA, and particularly Doynow, as a sales representative.  Specifically, Swimline did not want and never needed a sales representative, that DSA served no purpose, that Swimline did not want a sales representative who knew what it was buying at and what price to be in contact with Swimline's competitors, that Swimline's president preferred to be in direct communication with Rocheux's principals[,] that Doynow was nothing but a "messenger", that Doynow repeatedly failed to properly relay Swimline communications to Rocheux that Doynow was not competent and was an "irritation" . . . . After Swimline's repeated requests and the implication that Swimline would otherwise stop buying from Rocheux, on or before September 12, 2002 DSA was removed from the Swimline account.

(Rocheux Rule 56.1 Stmt. ¶¶ 8-9; Rocheux Opp. Rule 56.1 Stmt. ¶¶ 17-18.)  Further, Rocheux claims that "[o]n or before September 12, 2002 [DSA] 'agreed to step away' from the Swimline account," and that DSA accepted "$61,423.56 as compensation for being removed from the Swimline account." (Rocheux Rule 56.1 Stmt. ¶ 10; Rocheux Opp. Rule 56.1 Stmt. ¶¶ 19, 20 & Ex. D: 9/12/2002 E-mail.)

DSA neither "concedes nor contests that in 2002 Swimline advised Rocheux that it did not want a sales representative," that "Swimline wanted to be in direct contact with Rocheux's principals," or that "Swimline requested that DSA be removed from the Swimline account," but denies the rest of Rocheux's assertions, including that DSA accepted compensation for being removed from the Swimline account.  (DSA Opp. Rule 56.1 Stmt. ¶¶ 8-10.)  DSA claims that Rocheux, not Doynow,  upset Swimline when Rocheux "secured a deal" with a "low cost" Swimline competitor, and raised "the price it charged to Swimline . . . for swimming pool liners . . . . in the middle of the swimming pool season, leaving Swimline little if any time to react." (DSA Rule 56.1 Stmt. ¶¶ 111-21; Dkt. No. 35: Steven Doynow Aff. ¶¶62-72.)

Steven Doynow maintains that he "never agreed to accept a commission of less than 3% for DSA on sales to any Rocheux customer," that Rocheux ignored all complaints regarding payment, that Rocheux unilaterally reduced "the agreed-upon minimum 3% commission from Swimline orders" prior to entirely eliminating all Swimline commissions, and that he "immediately . . . protest[ed Rocheux's] unilateral decision to take the Swimline account from him." (DSA Rule 56.1 Stmt. ¶¶ 109-10, 123-25, 129, 132; Larry Doynow Aff. ¶¶ 29-30; Steven Doynow Aff. ¶¶ 73-76.)

**DSA Commissions on the Latham Account**

Latham Manufacturing is a "high volume customer" whose business DSA procured for Rocheux in 2003.  (Dkt. No. 37: DSA Rule 56.1 Stmt. ¶¶ 56-58; Dkt. No. 48: Rocheux Opp. Rule 56.1 Stmt. ¶ 21; Dkt. No. 35: Steven Doynow Aff. ¶¶ 42-44.)

Rocheux maintains that it "established [DSA]'s commission on Latham sales at 2%" from "the inception of the Latham account, pursuant to the Agreement, . . . and the profitability of the [Latham] account."  (Rocheux Opp. Rule 56.1 Stmt. ¶ 22.)  DSA maintains, however, that through Rocheux's "unilateral conduct," Rocheux paid less than "the 3% minimum specified in the parties' Agreement."  (DSA Rule 56.1 Stmt. ¶ 59; Steven Doynow Aff. ¶ 45.)

Rocheux claims that it had a "gross profit margin of 2%" in 2004 and "either br[oke] even or lo[st] money on every sale to Latham" because "[a]s a high volume customer, Latham demanded low prices," and because Rocheux "stored Latham finished inventory and delivered it to Latham as needed" at Rocheux's own cost.  (Rocheux Opp. Rule 56.1 Stmt. ¶¶ 23-25.)  Rocheux also

claims it made decreasing profit on Latham sales in 2005 and 2006, and that "[o]n February 16, 2006 [DSA] agreed to a commission rate reduction to 1.75% on new [Latham] orders, and the parties agreed to determine whether if by September [] 2006 marketing conditions would again allow a 2% rate." (Rocheux Opp. Rule 56.1 Stmt. ¶ 27-29.)

DSA maintains that in February 2006, Rocheux asked DSA "to temporarily accept a reduced 1.5% commission on Latham orders," and that DSA "did not repeat his insistence that [Rocheux] pay [DSA] the agreed-upon minimum 3% commission on Latham orders" because Rocheux "represent[ed] that it was facing substantial economic hardship with respect to the Latham account," and because DSA knew that Rocheux "would unilaterally reduce [DSA]'s commission regardless of whatever repeated objections [DSA] may have made." (DSA Rule 56.1 Stmt. ¶¶ 60-62; Steven Doynow Aff. ¶¶ 46-48.) DSA claims it agreed to "accept a 1.75% commission on Latham orders" "for a six month period only," and that on June 15, 2006, Rocheux unilaterally reduced DSA's Latham commission to 1%. (DSA Rule 56.1 Stmt. ¶ 62; Steven Doynow Aff. ¶ 48.) Rocheux describes this latter commission reduction as "necessary" because "[m]arket conditions did not improve and Latham refused to accept further price increases which Rocheux absorbed," and claims DSA "accepted" the reduction. (Rocheux Opp. Rule 56.1 Stmt. ¶ 30.) DSA responds that it promptly "protested this further commission reduction, but it had little effect on [Rocheux]'s behavior." (DSA Rule 56.1 Stmt. ¶ 64; Steven Doynow Aff. ¶ 49.) In addition, DSA claims that "[t]he Latham account's profitability was several times higher in 2006 than it was in 2005." (DSA Rule 56.1 Stmt. ¶ 63; see Dkt. No. 34: Lucas Aff. Ex. D: Rocheux COPA Reports.)

"On April 17, 2008, Rocheux's Vice President, Robert Stephanoff, sent DSA a memo asking DSA to sign a new agreement that, if signed, would have given DSA far fewer rights . . . if any rights.  Steven Doynow refused to sign the new agreement." (DSA Rule 56.1 Stmt. ¶ 69; Steven Doynow Aff. ¶ 53.)  On August 28, 2008, Steven Doynow e-mailed Rocheux's Vice President, Robert Stephanoff, that the existing Agreement did

> not permit a reduction of [DSA's] territory without mutual consent of both parties. Insofar as the proposed action by Rocheux would effectively reduce [DSA's] commissions to zero as a result of [the decision to] reassign and or convert Latham [and] Herculite into a house account, [DSA's] consent is not given and [DSA] shall represent those accounts pursuant to our contract.

(DSA Rule 56.1 Stmt. ¶ 71; Steven Doynow Aff. ¶¶ 55; Dkt. No. 18: Am. Compl. Ex. B: 8/28/08 E-mail.)

    Rocheux's Stephanoff replied:

> We are not reducing your territory.  We are re-assigning customers.  Paragraph 11 of the contract states that Schedule B can be modified by an agreement signed by both parties.  Schedule B lists the countries considered "territory."  It says nothing about the accounts within the territory.  Similarly, the Whereas paragraph states that Doynow is the sales rep for the designated territory "Subject to terms and conditions that are mutually agreeable".  This refers to your sales rep responsibilities and compensation, not customers.

(DSA Rule 56.1 Stmt. ¶ 72; Steven Doynow Aff. ¶ 56; Am. Compl. Ex. B: 8/29/08 E-mail.)  In addition, Stephanoff later claimed that Rocheux had the "authority" to "re-assign customers" under ¶ 2(b) of the Agreement which provides Rocheux "'the sole right . . . to establish such other policies and procedures as it may deem necessary for the effective marketing of its products.'"  (DSA Rule 56.1 Stmt. ¶ 74; Steven Doynow Aff. ¶ 58; Am. Compl. Ex. B: 9/4/2008 E-mail.)

**Smaller Accounts**

            DSA also claims that Rocheux "often failed to pay [DSA] the minimum 3% commission on a number of smaller accounts."  (Dkt. No. 37: DSA Rule 56.1 Stmt. ¶¶ 78-80; Dkt. No. 35: Doynow Aff. ¶¶ 59-61.)

## ANALYSIS

## I.      SUMMARY JUDGMENT STANDARD

        Rule 56(c) of the Federal Rules of Civil Procedure provides that summary "judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Lang v. Ret. Living Pub. Co., 949 F.2d 576, 580 (2d Cir. 1991).

        The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment.  See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  Instead, the non-moving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e);  accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct. at 1356; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (At summary judgment, "[t]he time has come . . . 'to put up or shut up.'") (citations omitted), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[3/] The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable, considering all the evidence presented.  See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

---

[3/]      See also, e.g., Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact.  See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987).  To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.  While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g., Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

"The same standard applies where, as here, the parties filed cross-motions for summary judgment . . . .  Moreover, even when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party.  Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Morales v. Quintel Entm't. Inc., 249 F.3d 115, 121 (2d  Cir. 2001) (citation omitted).[4/]  In this case, where

---

[4/]    Accord, e.g., Bronx Household of Faith v. Bd. of Educ. of City of N.Y., 492 F.3d 89, 96 (2d Cir. 2007); Barhold v. Rodriguez, 863 F.2d 233, 236 (2d Cir. 1988); Eastman Mach. Co. v. United States, 841 F.2d 469, 473-74 (2d Cir. 1988); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co., 618 F. Supp. 2d 280, 291 (S.D.N.Y. 2009); Alfano v. CIGNA Life Ins. Co., 07 Civ. 9661, 2009 WL 222351 at *13 (S.D.N.Y. Jan. 30, 2009) (Lynch, D.J.); U.S. S.E.C. v. Meltzer, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006); Donoghue v. Casual Male Retail Group,
(continued...)

plaintiff DSA and defendant Rocheux have cross-moved on the same claims, all factual inferences

on a particular issue have been drawn in favor of the party against whom judgment is being entered.

## II.   STANDARDS FOR CONTRACT INTERPRETATION UNDER NEW JERSEY LAW[5/]

Under New Jersey law, "[i]n construing a contract, a court first must make the

determination of whether the contractual term at issue is clear or ambiguous. That is a question of

law." Vanguard Prop. Group, Inc. v. Trocki, 2009 WL 465534 at *5 (N.J. Super. App. Div. Feb. 26,

2009) (citing Nester v. O'Donnell, 301 N.J. Super. 198, 210, 693 A.2d 1214, 1220 (App. Div. 1997),

quoting Kaufman v. Provident Life & Cas. Ins. Co., 828 F. Supp. 275, 282 (D.N.J. 1992), aff'd, 993

F.2d 877 (3d Cir. 1993)).[6/]

---

[4/]     (...continued)
         Inc., 375 F. Supp. 2d 226, 230 (S.D.N.Y. 2005); Neely v. Pension Trust Fund of the Pension,
         Hospitalization & Benefit Plan of the Elec. Indus., No. 00 CV 2013, 2004 WL 2851792 at
         *7 (E.D.N.Y. Dec. 8, 2004); Revlon Consumer Prods. Corp. v. Estee Lauder Cos., 00 Civ.
         5960, 2003 WL 21751833 at *7 (S.D.N.Y. July 30, 2003) (Peck, M.J.).

[5/]     "Any dispute arising under th[e] Agreement not resolved by agreement of the parties shall
         be . . . governed and construed by the laws of New Jersey, excluding New Jersey choice of
         law rules."  (See page 5 above.)

[6/]     See, e.g., McGrath v. Edwards, 2009 WL 2382302 at *8 (N.J. Super. App. Div. Aug. 5,
         2009); Grow Co. v. Chokshi, 403 N.J. Super. 443, 476, 959 A.2d 252, 272 (App. Div. 2008)
         ("It is true that whether a contract provision is clear or ambiguous is a question of law."); PSI
         Summit Hosp., Inc. v. Corporate Park Assocs., 2008 WL 2219872 at *7 (N.J. Super. App.
         Div. May 30, 2008) ("The issue of whether a contractual term is ambiguous is a question of
         law to be decided by the trial court."); Tyler v. New Brunswick Sch. Dist., 2008 WL 238615
         at *4 (N.J. Super. App. Div. Jan. 30, 2008).

Under New Jersey law, "[w]hen a contract is unambiguous, resolution by summary judgment is appropriate." Hepps v. Sgouros, 2007 WL 4441414 at *3 (N.J. Super. App. Div. Dec. 20, 2007).[7/] "'The interpretation of the terms of a contract are decided by the court as a matter of law unless the meaning is both unclear and dependent on conflicting testimony.'" Celanese Ltd. v. Essex County Improvement Auth., 404 N.J. Super. 514, 528, 962 A.2d 591, 600 (App. Div. 2009) (quoting Bosshard v. Hackensack Univ. Med. Ctr., 345 N.J. Super. 78, 92, 783 A.2d 731, 740 (App. Div. 2001)).[8/] "The determination that a contractual provision is clear or ambiguous is itself a matter of law, because it is an assessment of whether the provision's meaning can be determined without a need to resolve 'conflicting testimony.'" Leary v. Pepperidge Farm, Inc., 2009 WL 2426345 at *9 (N.J. Super. App. Div. Aug. 10, 2009) (citations omitted).[9/]

---

[7/]   See, e.g., CSFB 2001-CP-4 Princeton Park Corp. Ctr., LLC, v. SB Rental I, LLC, -- A.2d --, 2009 WL 2431530 (N.J. Super. App. Div. Aug. 11, 2009) ("Cases involving contract interpretations are particularly suited to disposition by summary judgment."); Maksin Mgmt. Corp. v. Roy A. Rapp, Inc., 2008 WL 3165465 at *6 (N.J. Super. App. Div. Aug. 8, 2008), cert. denied, 197 N.J. 259, 962 A.2d 530 (2008); F. James Donnelly, P.C. v. Copelco Capital Inc., 2007 WL 1062066 at *1 (N.J. Super. App. Div. Apr. 11, 2007); Driscoll Constr. Co. v. State, Dep't. of Transp., 371 N.J. Super. 304, 313, 853 A.2d 270, 276 (App. Div. 2004).

[8/]   Accord, e.g., Baer v. Prudential Life Ins. Co., 2008 WL 4998481 at *4 (N.J. Super. App. Div. Nov. 26, 2008); Passaic County Bd. of Soc. Servs. v. Commc'ns Workers of Amer., AFL-CIO, 2007 WL 1827245 at *4 (N.J. Super. App. Div. June 27, 2007), cert. denied, 193 N.J. 585, 940 A.2d 1218 (2008); Fitts v. Chase Manhattan Mortg. Corp., 2006 WL 3432296 at *2 (N.J. Super. App. Div. Nov. 30, 2006).

[9/]   See, e.g., Estate of Evans v. Your Casting Connection, L.L.C., 2007 WL 4258364 at *8 (N.J. Super. App. Div. Dec. 6, 2007) ("Whether a contract is ambiguous is a matter of law to be decided by the court."); BOC Group, Inc. v. Fed. Ins. Co., 2007 WL 2162437 at *8 (N.J. Super. App. Div. July 30, 2007); R.J. Brunelli & Co. v. Jamm Realty Corp., 2005 WL (continued...)

A court "'determine[s] a written agreement's validity by considering the intentions of the parties as reflected in the four corners of the written instrument.'"  Cost Reduction Solutions v. Durkin Group, LLC, 2008 WL 3905679 at *3 (N.J. Super. App. Div. Aug. 22, 2008) (quoting Leodori v. CIGNA Corp., 175 N.J. 293, 302, 814 A.2d 1098, 1104, cert. denied, 540 U.S. 938, 124 S. Ct. 74 (2003)).[10/]  "'It is not the court's function to make a better contract for the parties or to supply terms that have not been agreed upon.'"  69 Franklin JC, L.L.C. v. Catalano, 2009 WL 2015125 at *3 (N.J. Super. App. Div. July 14, 2009) (quoting Schenck v. HJI Assocs., 295 N.J. Super. 445, 450, 685 A.2d 481, 484 (App. Div. 1996), cert. denied, 149 N.J. 35, 692 A.2d 48 (1997)).[11/]  Furthermore, "[w]hen construing a contract, the terms of the contract must be given their 'plain and ordinary meaning' and the writing must be interpreted as a whole." Norton v. Atl. Chrysler

---

[9/]   (...continued)
3839827 at *3 (N.J. Super. App. Div. Mar. 10, 2006), cert. denied, 187 N.J. 79, 899 A.2d 302 (2006); Cooper River Plaza E., LLC v. Briad Group, 359 N.J. Super. 518, 529, 820 A.2d 690, 696-97 (App. Div. 2003); Nester v. O'Donnell, 301 N.J. Super. at 210, 693 A.2d at 1220.

[10/]   Marlboro Inn, LLC v. Marlboro Loft Partners, LLC,  2008 WL 2952025 at *4 (N.J. Super. App. Div. Aug. 4, 2008); Hong Nie v. Yang Zi, 2008 WL 2951871 at *2 (N.J. Super. App. Div. July 22, 2008); LaCorte Agency, LLC v. C & L Developers, Inc., 2008 WL 2737343 at *2 (N.J. Super. App. Div. July 3, 2008); Bernisky v. U.S. Logistics, Inc., 2008 WL 2492249 at *2 (N.J. Super. App. Div. June 19, 2008); Bank of America v. Philip Kushner Assocs., 2008 WL 2492247 at *3 (N.J. Super. App. Div. June 18, 2008).

[11/]   See, e.g., Cost Reduction Solutions v. Durkin Group, LLC, 2008 WL 3905679 at *3; Marlboro Inn, LLC v. Marlboro Loft Partners, LLC,  2008 WL 2952025 at *4; Hong Nie v. Yang Zi, 2008 WL 2951871 at *2; Maltese v. Consultedge, Inc., 2008 WL 2744241 at *4 (N.J. Super. App. Div. July 16, 2008); Township of East Brunswick v. Transcon. Gas Pipeline Corp., 2008 WL 2627688 at *7 (N.J. Super. App. Div. July 7, 2008), cert. denied, 198 N.J. 317, 966 A.2d 1081 (2009).

Plymouth, Inc., 2009 WL 1258100 at *2 (N.J. Super. App. Div. May 8, 2009) (citing Nester v. O'Donnell, 301 N.J. Super. at 210, 693 A.2d at 1220).[12/]   "[W]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written."  Karl's Sales & Serv., Inc. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 493, 592 A.2d 647,  650 (App. Div.), cert. denied, 127 N.J. 548, 606 A.2d 362 (1991).[13/]

Although "[t]he construction of a written contract is usually a legal question for the court, . . . where there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury."  Great Atl. & Pac. Tea Co. v. Checchio, 335 N.J. Super. 495, 502, 762 A.2d 1057, 1061 (App. Div. 2000) (citing Michaels v. Brookchester, Inc.,

---

[12/]    See, e.g., Leary v. Pepperidge Farm, Inc., 2009 WL 2426345 at *9 (N.J. Super. App. Div. Aug. 10, 2009) ("New Jersey courts endeavor to give effect to all of a contract's provisions. Such an interpretation 'will be preferred to one which leaves a portion of the writing useless or inexplicable.") (citations omitted); ATIM Family P'ship v. LMW Props. Corp., 2009 WL 857456 at *4 (N.J. Super. App. Div. Apr. 2, 2009) ("To determine the meaning of the terms of an agreement by the objective manifestations of the parties' intent, the terms of the contract must be given their 'plain and ordinary meaning.'") (citation omitted); Perry v. N.J. Sports & Exposition Auth., 2008 WL 3287203 at *9 (N.J. Super. App. Div. Aug. 12, 2008) ("Contracts are generally given their plain and ordinary meaning."); Youngblood v. Youngblood, 2007 WL 2301621 at *3 (N.J. Super. App. Div. Aug. 13, 2007); Jankowitz v. Jankowitz, 2006 WL 2239125 at *7 (N.J. Super. App. Div. Aug. 7, 2006); Attardo v. Murphy, 2005 WL 2334360 at *3 (N.J. Super. App. Div. Sept. 23, 2005).

[13/]    See, e.g., Siegelman v. Weinstein, 2009 WL 2382248 at *3 (N.J. Super. App. Div. Aug. 5, 2009); Exxon Mobil Corp. v. Bouras Props., LLC, 2009 WL 775095 at *5 (N.J. Super. App. Div. Mar. 26, 2009), cert. denied, 199 N.J. 541, 973 A.2d 945 (2009); Maltese v. Consultedge, Inc., 2008 WL 2744241 at *2; Clifton Sav. Bank, S.L.A. v. Source 1 Capital Corp., 2007 WL 3224760 at *4 (N.J. Super. App. Div. Nov. 2, 2007); Meyers v. RCM Tech., Inc., 2005 WL 3246727 at *22 (N.J. Super. App. Div. Dec. 2, 2005), cert. denied, 186 N.J. 366, 895 A.2d 452 (2006).

26 N.J. 379, 387, 140 A.2d 199, 204 (1958)).[14]  "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations."  Kaufman v. Provident Life & Cas. Ins. Co., 828 F. Supp. at 283.[15]  "When a contract term is ambiguous, that rule of contract interpretation requires a court to adopt the meaning that is most favorable to the non-drafting party." Pacifico v. Pacifico, 190 N.J. 258, 267, 920 A.2d 73, 78 (2007).[16]

"[W]here the language in a contract is ambiguous, extrinsic evidence may be introduced to determine its meaning,"  Norton v. Atl. Chrysler Plymouth, Inc., 2009 WL 1258100

---

[14]     See, e.g., Cost Reduction Solutions v. Durkin Group, LLC, 2008 WL 3905679 at *3; Eldredge v. Skelly, 2007 WL 1598540 at *3 (N.J. Super. App. Div. June 5, 2007); Twist v. Home Depot U.S.A., Inc., 2007 WL 209927 at *4 (N.J. Super. App. Div. Jan. 29, 2007); Driscoll Constr. Co. v. State, Dep't. of Transp., 371 N.J. Super. at 314, 853 A.2d at 276; Schor v. FMS Fin. Corp., 357 N.J. Super. 185, 193-94, 814 A.2d 1108, 1113-14 (App. Div. 2002); see also Leary v. Pepperidge Farm, Inc., 2009 WL 2426345 at *9 ("When the meaning of an ambiguous contractual provision depends on the implications of parol evidence, the provision's meaning must be determined by a jury.").

[15]     See, e.g., Chubb Custom Ins. Co. v. Prudential Ins. Co., 195 N.J. at 238, 948 A.2d at 1289; McGrath v. Edwards, 2009 WL 2382302 at *8; Grow Co. v. Chokshi, 403 N.J. Super. at 476, 959 A.2d at 272; G. Pacillo Contracting, Inc. v. Township of S. Orange Vill., 2008 WL 2811540 at *4 (N.J. Super. App. Div. July 23, 2008); Tyler v. New Brunswick Sch. Dist., 2008 WL 238615 at *4 (N.J. Super. App. Div. Jan. 30, 2008); Preserver Group v. Bragin, 2007 WL 2593089 at *4 (N.J. Super. App. Div. Sept. 11, 2007); Nadel v. Starkman, 2006 WL 3228614 at *3 (N.J. Super. App. Div. Nov. 9, 2006); Attardo v. Murphy, 2005 WL 2334360 at *3 (N.J. Super. App. Div. Sept. 23, 2005).

[16]     See, e.g., Chubb Custom Ins. Co. v. Prudential Ins. Co., 195 N.J. 231, 238, 948 A.2d 1285, 1289 (2008); Villa v. Short, 195 N.J. 15, 30, 947 A.2d 1217, 1226 (2008); Cost Reduction Solutions v. Durkin Group, LLC, 2008 WL 3905679 at *3; Perry v. N.J. Sports & Exposition Auth., 2008 WL 3287203 at *9; Estate of Albanese v. Lolio, 393 N.J. Super. 355, 374, 923 A.2d 325, 336 (App. Div.), cert. denied, 192 N.J. 597, 934 A.2d 639 (2007).

at *2 (citing Schor v. FMS Fin. Corp., 357 N.J. Super. at 192, 814 A.2d at 1112),[17/] including when the contract is an integrated document, although never to vary or alter the terms of the document. See Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 268-70, 901 A.2d 341, 346-47 (2006) ("In general, the parol evidence rule prohibits the introduction of evidence that tends to alter an integrated written document."  However, "'[e]vidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity.'") (emphasis added) (quoting Atl. N. Airlines v. Schwimmer, 12 N.J. 293, 301-02, 96 A.2d 652, 656 (1953) ("The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance.  Such evidence is adducible only for the purpose of interpreting the writing – not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said.").[18/]

New Jersey law

> permit[s] a broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties. . . .  Such evidence may "include consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct."

---

[17/]   See, e.g., Chubb Custom Ins. Co. v. Prudential Ins. Co. of America, 195 N.J. at 238, 948 A.2d at 1289; Siegelman v. Weinstein, 2009 WL 2382248 at *3 ("To discover the intention of the parties, and to determine whether a contract is ambiguous, courts may consider extrinsic evidence offered in support of conflicting interpretations.").

[18/]   See, e.g., Reutter v. Dalsey, 2009 WL 1686624 at *5 (N.J. Super. App. Div. June 18, 2009); Fioretti v. Cangialosi, 2009 WL 454333 at *8 (N.J. Super. App. Div. Feb. 25, 2009); Bernisky v. U.S. Logistics, Inc., 2008 WL 2492249 at *2-3; Smith v. Tyco Int'l. (US), Inc., 2007 WL 1039067 at *2-3 (N.J. Super. App. Div. Apr. 9, 2007); Wachovia Bank v. Gadbey Org., 2005 WL 2559780 at *11 (N.J. Super. App. Div. Oct. 5, 2005).

Conway v. 287 Corp. Ctr. Assocs., 187 N.J. at 269-70, 901 A.2d at 347 (quoting Kearny PBA Local

No. 21 v. Town of Kearny, 81 N.J. 208, 221, 405 A.2d 393, 400 (1979)).[19/]  "To discover the

intention of the parties, and to determine whether a contract is ambiguous, courts may consider

extrinsic evidence offered in support of conflicting interpretations.  Such [extrinsic] evidence may

include the structure of the contract, the bargaining history, and the conduct of the parties that

reflects their understanding of the contract's meaning."  Siegelman v. Weinstein, 2009 WL 2382248

at *3 (citations omitted, quoting Restatement (Second) of Contracts § 223 cmt. b).[20/]  "In addition,

insight into the parties' intentions in entering into an agreement may be gained by resort to their

subsequent actions."  Passaic Beth Israel Hosp. v. Perez, 2008 WL 612308 at *4 (N.J. Super. App.

Div. Mar. 7, 2008) (citing Michaels v. Brookchester, Inc., 26 N.J. at 388, 140 A.2d at 204 ("Where

ambiguity exists, the subsequent conduct of the parties in the performance of the agreement may

serve to reveal their original understanding.")).[21/]  "It is only after the meaning of the contract is

---

[19/]    See, e.g., Smith v. Tyco Int'l. (US), Inc., 2007 WL 1039067 at *3.

[20/]    See, e.g., Haverty v. Andres & Berger, P.C., 2004 WL 2701040 at *7 (N.J. Super. App. Div. Nov. 9, 2004) (concluding "that 'a trier of fact could find that in the absence of a definite agreement between the parties' regarding the [sales commission] calculation method [that] 'th[e] course of dealing established their agreement concerning the method by which plaintiff's commissions would be calculated'"), cert. denied, 182 N.J. 430, 866 A.2d 987 (2005); Winslow v. Corp. Express, Inc., 364 N.J. Super. 128, 138, 834 A.2d 1037, 1043 (App. Div. 2003) ("One form of conduct which may manifest the parties' intent is a course of dealing that establishes 'a common basis of understanding for interpreting their expressions and other conduct.'") (quoting Restatement (Second) of Contracts § 223(1)).

[21/]    See, e.g., Spadoro v. Gentile, 2009 WL 1685171 at *12 (N.J. Super. App. Div. June 18, 2009); Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co., 231 N.J. Super. 1, 15, 554 A.2d 1342, 1350 (App. Div. 1989).

discerned that the parol evidence rule comes into play to prohibit the introduction of extrinsic evidence to vary the terms of the contract." Conway v. 287 Corp. Ctr. Assoc., 187 N.J. at 270, 901 A.2d at 347. "Although courts may use course of performance and course of dealing in interpreting contract terms, 'express terms are given greater weight than course of performance [and] course of dealing.'" Siegelman v. Weinstein, 2009 WL 2382248 at *3 (quoting Restatement (Second) of Contracts § 203).

## III.   DSA AND ROCHEUX ARE DENIED SUMMARY JUDGMENT AS TO WHETHER ROCHEUX VIOLATED THE AGREEMENT WHEN IT REDUCED DSA'S COMMISSIONS BELOW 3% ON THE SWIMLINE & LATHAM ACCOUNTS

Schedule A of the Agreement requires Rocheux to pay DSA a commission of 3-5% except "in order to entertain large volume accounts" when "necessary upon mutual agreement." (See page 3 above.) Swimline and Latham clearly constitute "large volume account[s]." See (Dkt. No. 48: Rocheux Opp. Rule 56.1 Stmt. Att.: Steed Dep. at 125:14-18; Rocheux Opp. Rule 56.1 Stmt. ¶¶ 21, 23 & Att.: Steven Doynow Dep. at 137: 7-13.)

The Court rejects Rocheux's argument that because Agreement ¶ 2B allows Rocheux to "establish the terms and conditions of any sale it makes" and "establish such other policies or procedures as it may deem necessary for the effective marketing of its products," it could unilaterally reduce DSA's commissions below 3%. (See page 5 above.) Such an interpretation would render Schedule A's provisions of 3-5% except where mutually agreed to be "useless or inexplicable." Leary v. Pepperidge Farm, Inc., 2009 WL 2426345 at *9 (N.J. Super. App. Div. Aug. 10, 2009).

The issue, then, is whether the exceptions to the 3-5% commission in Schedule A – "necessary upon mutual agreement" – have been met.

As to whether Rocheux <u>necessarily</u> reduced DSA's commission rates, neither party has provided sufficient evidence for this Court – on the record before it – to properly determine how both parties construed necessity under Schedule A of the Agreement.  Indeed, this Court doubts that the parties can clarify whether Rocheux acted out of necessity due to the inherently subjective and ambiguous nature of the term "necessary" in the Agreement.  However, because it is theoretically possible for the parties to use extrinsic evidence to adequately explain and demonstrate to a jury what constituted Schedule A necessity, and whether the repeated decision to pay DSA rates below 3% resulted from necessity, this issue should proceed to trial.  "Where, as here, 'contract terms are unspecific or vague, extrinsic evidence may be used to shed light on the mutual understanding of the parties.'"  <u>In re Township of Middletown</u>, 2008 WL 3461071 at *6 (N.J. Super. App. Div. Aug. 14, 2008) ("The past practice of the contracting parties is entitled to great weight in determining the meaning of ambiguous or doubtful contractual terms.") (quoting <u>Hall</u> v. <u>Bd. of Educ. of Twp. of Jefferson, Morris County</u>, 125 N.J. 299, 307, 593 A.2d 304, 305-06 (1991)).[22]

---

[22]    <u>See</u>, <u>e.g.</u>, <u>Pall Mall Corp. Hospitality, Inc.</u> v. <u>Gage Travel, Inc.</u>, 00 Civ. 0851, 2000 WL 1745046 at *4 (S.D.N.Y. Nov. 28, 2000) (applying N.J. law); <u>see also</u> <u>Haverty</u> v. <u>Andres & Berger, P.C.</u>, 2004 WL 2701040 at *11 (N.J. Super. App. Div. Nov. 9, 2004), <u>cert. denied</u>, 182 N.J. 430, 866 A.2d 987 (2005), quoting 1 Corbin on Contracts, § 4.7 (Perillo rev.1993)) ("Even though the parties have expressed an agreement in terms so vague and indefinite as to be incapable of interpretation with a reasonable degree of certainty, they may cure this defect by later verbal clarification or their subsequent conduct that indicates their own practical interpretation.").

If, however, the jury is unable to determine what constitutes necessity under the Agreement, this Court likely will find that the Agreement term "necessary" is too vague and unspecific to bind the parties, and will read it out of the Agreement.  Cost Reduction Solutions v. Durkin Group, LLC, 2008 WL 3905679 at *3, 4 (N.J. Super. App. Div. Aug. 22, 2008) (affirming the trial court's summary judgment order in favor of defendants where court determined a non-compete agreement "to be so vague, ambiguous and unclear that plaintiffs would not be able to establish the right to enforce the agreement").

In addition, this Court concludes that whether DSA and Rocheux mutually agreed to lower commission rates under Schedule A constitutes a disputed question of material fact, and thus has to be determined by the jury.  Although Rocheux has not submitted any concrete evidence that DSA explicitly agreed to such rate reductions,[23] the parties' course of performance over the years at issue demonstrates that DSA may have tacitly accepted commission rates below 3%.  (See Rocheux Opp. Rule 56.1 Stmt. Ex. B: Paid Sales Commission Report: 11/1/99-12/31/03 (Swimline commission rates varying from .5%-3%) & Ex. C: Paid Sales Commission Report: 1/1/02-10/14/08 (commission rates varying from 1%-3%).)  Furthermore, the record before this Court indicates that Steven Doynow only intermittently and mildly protested the majority of the commission reductions.

---

[23]    The sole exception may be DSA's decision to accept a reduced rate on the Latham account in 2006 when it agreed to accept a 1.75% commission rate for at least a period of time.  (See Rocheux Opp. Rule 56.1 Stmt. Ex. F: 2/16/06 E-mails; see also Rocheux Opp. Rule 56.1 Stmt. Ex. G: 6/15/06 E-mail.)  DSA disputes that this one instance demonstrates a course of dealing in which DSA agreed to lower commission rates (see Dkt. No. 55: DSA Reply Br. at 7-8), but this Court need not decide this issue as it is a factual question to be decided by the jury.

(<u>See</u> Rocheux Opp. Rule 56.1 Stmt. Ex. F: 2/16/06 E-mails; Rocheux Opp. Rule 56.1 Stmt. Att.:

Steed Dep. at 25, 26, 35, 128 (Steven Doynow was aware that Rocheux had the "final say in the

event of a disagreement" over the commission rate, Steven Doynow never advised Steed "that he

considered Rocheux to be in bre[a]ch of his contract," and Steven Doynow "was not shy in telling

[Steed] he was not happy with his commissions being cut.") & Steven Doynow Dep. at 41, 51, 53,

54 (Doynow could not recall whether he ever attempted to terminate his Agreement with Rocheux

because of the commission rate he was paid, whether he ever stated that he would not accept a

certain commission rate and needed a "named percentage," and why a certain commission rate was

"set at one percent."); <u>see also</u> Dkt. No. 36: Larry Doynow Aff. ¶¶ 29-30 ("I never agreed to accept

a commission of less than 3% for DSA on sales to any Rocheux customer, and I complained to

Rocheux in those instances when Rocheux decided to pay me less than 3%. . . . My complaints never

did any good because Rocheux simply did as it pleased and paid DSA whatever it wanted to pay.").)

DSA's apparent acquiescence to reduced commission rates on a number of occasions

in conjunction with the uniformity with which DSA received lowered commissions rates over a long

period of time creates– just <u>barely</u> – a genuine issue of material fact for the jury as to whether

"mutual agreement" existed under Schedule A.  If the jury finds that DSA and Rocheux did not

mutually agree to lower Swimline's and/or Latham's commission rates (putting the issue of necessity

to the side), then DSA is entitled to damages for any reductions below 3% on the Swimline and Latham accounts.[24]

DSA's and Rocheux's cross-summary judgment motions on reduction of commission rates for the Swimline and Latham accounts are DENIED.[25]

------

[24]   DSA also argues that the New Jersey Sales Representatives' Rights Act ("SRRA") precludes Rocheux from reducing DSA's commission rates under the Agreement, because the SRRA "fully protects independent sales reps from any diminution of their contractual right to commission payments." (Dkt. No. 42: DSA Br. at 5-7; Dkt. No. 52: DSA Opp. Br. at 15, 21; Dkt. No. 55: DSA Reply Br. at 1-3.)  The SRRA provides that

> When a contract between a principal and a sales representative to solicit orders is terminated, the commissions and other compensation earned as a result of the representative relationship and unpaid shall become due and payable within 30 days of the date the contract is terminated or within 30 days of the date commissions are due, whichever is later.

> A sales representative shall receive commissions on goods ordered up to and including the last day of the contract even if accepted by the principal, delivered, and paid for after the end of the agreement. The commissions shall become due and payable within 30 days after payment would have been due under the contract if the contract had not been terminated.

N.J. Stat. Ann. §§ 2A:61A-2 (2009) (emphasis added)

"[B]y enacting the SRRA, the [New Jersey] Legislature saw fit to insure that independent sales representatives not only received their commissions after the termination of their contractual relationship, but also that payment was made to them essentially in accordance with that prior agreement." Neal v. E. Controls, Inc., 2008 WL 706853 at *7 (N.J. Super. App. Div. Mar. 18, 2008) (emphasis added).  Thus, the SRRA has no applicability here because neither Rocheux nor DSA have terminated the Agreement, which continues in force. (See page 4 above.)

[25]   If the jury finds for DSA on the issue of commission reductions, it may not award damages for any commissions "due prior to September 17, 2002" (DSA Opp. Br. at 16), because the
(continued...)

## IV.   DSA & ROCHEUX ARE DENIED SUMMARY JUDGMENT AS TO WHETHER ROCHEUX VIOLATED THE AGREEMENT WHEN IT REMOVED DSA FROM THE SWIMLINE ACCOUNT

This Court cannot determine – on the record before it – whether Rocheux breached the Agreement when it turned DSA's accounts into "'house accounts,'" either reducing DSA's "commissions to 0%" or "withholding all but a small portion of [DSA]'s commissions."  (Dkt. No. 42: DSA Br. at 18-24; Dkt. No. 52: DSA Opp. Br. at 10-15; Dkt. No. 55: DSA Reply Br. at 8-10.)

Rocheux argues that "[t]he Agreement contains no . . . provision which prohibits Rocheux from removing a sales representative from an account," and that "[t]he language of the Agreement expresses the clear intent that commissions are paid for the ongoing and continuing rendering of those services[,] . . . preclud[ing] payment of commissions once services cease."  (Dkt. No. 41: Rocheux Br. at 4; Dkt. No. 54: Rocheux Reply Br. at 8-10.)  On the other hand, DSA argues that the "Agreement does not contain any clause permitting Rocheux to convert DSA's accounts into house accounts . . . ."  (Dkt. No. 37: DSA Rule 56.1 Stmt. ¶ 20; see also Dkt. No. 42: DSA Br. at 20: "If Defendant wanted to include a provision [in the Agreement] granting it the right to reassign Plaintiff's accounts, it could have easily done so, but it did not.")

The Agreement provides that Rocheux shall compensate DSA for "Products shipped based on orders, released and options exercised and accepted by Rocheux during the term of this

---

25/        (...continued)
          instant complaint was filed on September 17, 2008 (see Dkt. No. 1 Compl.), and the New Jersey statute of limitations for breach of contract claims is six years.  See N.J. Stat. Ann. § 2A:14-1 (2009).

Agreement <u>through the efforts of</u>" DSA.  (Dkt. No. 40: Schwartz Aff. Ex. A: Agreement at p. 12, Schedule A, emphasis added.)  Under the Agreement, paragraphs 3A, 3B, 3F, 4A and 4B, which detail DSA's responsibilities and compensation,  require DSA to "maintain . . . adequate facilities," "maintain good relationships with all of Rocheux's . . . customers and to work constantly and diligently in the best interest of Rocheux," "maintain records," and provides compensation "for services rendered by [DSA] under this Agreement," and provides that DSA "agrees to use its best efforts to maintain [Rocheux]'s reputation and image . . . during the period of this Agreement." (<u>See</u> page 6 above.)

Although paragraphs 3A, 3B, 3F, 4A and 4B suggest that DSA would receive commissions only for ongoing and continuing efforts made on Rocheux's behalf, <u>i.e.</u>, based on sales generated through DSA's continuing efforts, and not for its initial efforts in bringing Swimline to Rocheux, the Agreement is ambiguous.  Simply because DSA agreed, under paragraph 3, to continually act on Rocheux's behalf does not necessarily mean that Rocheux had the right to entirely remove a sales account previously awarded to DSA under the Agreement, or that DSA could not be compensated for sales in which DSA's initial efforts – as opposed to its ongoing efforts – led to sales by Rocheux.   In addition, although paragraph 4A provides that commission on "multi-year agreements . . . shall be paid only upon orders . . . accepted by Rocheux," it is possible to read paragraph 4A as describing the mechanism as to when payment is triggered from a multi-year agreement that DSA generated.  But it also can be read to suggest that unless DSA's ongoing efforts generated a sale, it would not get a commission merely because the customer was designated as

DSA's account.  In other words, if DSA was meant to get commissions on every Rocheux sale to a DSA account, the multi-year agreement provision in paragraph 4A would not be necessary.

Because this Court finds the Agreement ambiguous, it may use extrinsic evidence, including the parties' "subsequent actions," to gain "insight into the parties' intentions in entering into an agreement."  Passaic Beth Israel Hosp. v. Perez, 2008 WL 612308 at *4 (N.J. App. Div. 2008). DSA claims that:

> Rocheux considered Swimline to be DSA's account, and DSA and Rocheux engaged in a 10 ½-year course of conduct in which DSA received a commission on every single paid Swimline order. . . .  This course of conduct – initiated and carried out by Rocheux – demonstrates that all Swimline orders were recognized by both parties as having been generated through the efforts of DSA, regardless of whether DSA was involved in handling a particular order.

(Dkt. No. 51: Steven Doynow Opp. Aff. ¶¶ 4-5.)  In addition, DSA maintains that "[u]pon bringing in the account, the [DSA] rep. is deemed by Rocheux to be the sales rep on the account as long as the orders continued from that customer."  (Steven Doynow Opp. Aff. ¶ 69.)  According to DSA, Rocheux regularly credited DSA with all sales to DSA's accounts (until Rocheux converted Swimline to a "house" account).  (Dkt. No. 35: Steven Doynow Aff. ¶ 35; see also id. ¶¶ 28-38.) Furthermore, a former Rocheux employee responded "Yes" when asked at her deposition "[i]f a Rocheux customer stops doing business with Rocheux and comes back to Rocheux years later through the effort of a given rep, would that rep be deemed to be the sales rep on the account as long as the orders continued from that customer."  (Dkt. No. 49: Lucas Opp. Aff. Ex. B: Steed Dep. at 63.) There also is a dispute as to whether DSA agreed to "'step away'" from the Swimline account, while

DSA claims that it protested Rocheux's decision to take the Swimline account away from it.  (See pages 9-10 above.)

There exists, therefore, a genuine issue of material fact for the jury as to whether the Agreement allows Rocheux to remove the Swimline account from DSA prior to the Agreement's termination, due to ambiguity in the contract and conflicting extrinsic evidence regarding the parties' subsequent conduct.[26]   DSA's and Rocheux's summary judgment motions on removal of the Swimline account are DENIED.[27]

---

[26]   In addition, Rocheux and DSA dispute whose efforts brought Swimline to Rocheux: Swimline claims that it brought Swimline to Rocheux through a previous relationship with Swimline, while Rocheux claims that Swimline "cold called" Rocheux which then subsequently assigned the account to DSA.  (See page 8 above.)  If the jury determines that the Agreement – as evidenced by subsequent conduct – precluded Rocheux from taking the Swimline account from DSA once it had assigned the account to Rocheux, it may also consider whether or not DSA brought Swimline to Rocheux in the first place.  On the instant motion, that clearly constitutes a material question for the jury.

[27]   Although the New Jersey statute of limitations for breach of contract claims is six years (see page 27 n.25 above), and Rocheux removed DSA from the Swimline account on September 12, 2002 (Dkt. No. 43: Rocheux Rule 56.1 Stmt. ¶ 9) six years and one week prior to filing the instant action (see Dkt. No. 1: Compl.), DSA's claim is timely because Rocheux's removal of DSA from the Swimline account did not terminate the Agreement. If the jury finds that Rocheux improperly removed Swimline from DSA, Rocheux will owe DSA commission payments for sales to Swimline for the six years preceding this action, i.e., commission payments which fall within the applicable statute of limitations.

32

## **CONCLUSION**

For the reasons set forth above, DSA's and Rocheux's summary judgment motions are DENIED.   Pursuant to the Court's Scheduling Order, the Joint Proposed Pretrial Order is due by September 25, 2009.

SO ORDERED.

DATED:       New York, New York
                    August 24, 2009

**Andrew J. Peck**
United States Magistrate Judge

Copies mailed to:       Scott A. Lucas, Esq.
                                  Steven M. Sack, Esq.
                                  Clifford Schwartz, Esq.

H:\OPIN\DOYNOW